This case comes to us upon certificate from the Court of Civil Appeals for the First Supreme Judicial District. The statement and questions are as follows:
"This is a suit by appellee against appellant to recover damages for personal injuries. The circumstances under which appellee was injured are thus detailed by the witnesses:
"Plaintiff testified that at the time he was injured he was a member of a bridge gang of defendant, with which he had been working about two months. `We were at Kilgore at the time, and were putting up a platform, repairing the cotton platform there, the railroad company's cotton platform. We were putting in a new floor on it, and had torn it down and were building it new, but used some of the old material in doing so. . . . There was a shed on the platform, I suppose for a fruit shed. It was on posts that ran up from the ground through the platform. In tearing up the platform we left the posts standing so that they held the shed on them. The shed didn't extend over the whole platform; it was nearer to the south side than to the north and nearer to the east side than to the west side of the platform. We tore away the south end of the platform and repaired that, but left *Page 502 
the posts standing that supported the shed. After we had repaired the south end there was some cotton on the north end that we started to roll to the new or repaired part of the platform. There was a space between the old part of the platform and the new or repaired part, and we laid some planks across this space to roll the cotton across on. The space was about six to ten feet in width. The planks we used were one by twelve feet, and we laid six across, double. We were rolling the cotton across on the planks to keep front having to get down on the ground to lift it across. There were somewhere between eighteen and twenty-five bales of cotton on the platform. The foreman put me and one fellow together and three other men together. There were only five men on the platform. There were eight men in the bridge gang, but the other three were somewhere else cutting wood and doing other things. The man rolling with me was Gus Little, and the other three who were rolling the cotton were Claude Little, John Springer and Robert Sims. These last three men were rolling a different bale from the one Gus Little and I were rolling. I did not roll any bale with Claude Little, Robert Sims, John Springer or either of them. Every bale that I rolled Gus Little and I rolled together. We rolled the cotton from the north end of the platform to the south end, and in doing so we had to change the course of the bales of cotton at the shed. When we got to a post on which the shed was standing we changed the direction of the bales, so as to cross on the planks between the old portion and the new portion of the platform. We changed the direction from west to southwest or south right at the post. The course of every bale of cotton rolled by Gus Little and myself, and by Claude Little and the others with him, was changed at that post in order to get it across on the planks. We were handling the cotton with our hands, our naked hands. Gus Little and I had rolled about four or five, or maybe six, bales across when the accident happened, and Claude Little, Robert Sims and John Springer had rolled about the same number. We were rolling one bale after another and we had been doing that way, and we had to stop every time to change the course of the bales at that post, and we had reached that place and I was right in a stooping position, with my right foot out behind me, and they rolled the bale of cotton on me, on my leg and foot. I was stooping over at the time to pick up the bale of cotton we were rolling. I did not see the bale that fell on me as it was coming upon me; I had my back to it. I could not have seen it and at the same time have attended to the rolling of my own bale. The bale that fell on me was on its edge and fell flatways on my heel and the calf of my leg.'
"Cross-examined: `The men rolling the bale of cotton that fell on my foot were employed by the same foreman I was employed by. All of them were getting the same wages. They were working under the same foreman at the time I was hurt. All the men were employed by the same company. They were working in the same bridge gang over which Mr. Moore had control. All of them received their pay from the same source. We were in the same grade of employment; not one of them had any authority over me nor I over them, and none of them had authority over the other. We were all doing the same general *Page 503 
character of work, that is, rolling cotton I don't suppose there is any rule of the company requiring me to work with any particular man, and I don't know of any such rule; I never heard of it if there was such a rule. There was no rule of the company at that time requiring any particular man to work with me. We were moving all the cotton from one end of the platform to the other so as to repair the platform. I have handled some cotton before that, but not a big lot of it. The man working with me and holding the other end of the bale of cotton with me occupied the same position and relation to the company in all respects that I did, and the three men behind me did the same. At the time I and my partner were rolling the bale of cotton, and at the time I got hurt, I knew the other men were behind us.'
"Redirect. `The accident happened about ten o'clock in the morning. There was nothing at all to keep those rolling the bale of cotton up behind us from seeing us. There was nothing between us but the open platform. They rolled this bale of cotton on me right at the corner where the bale was stopped to change its direction. They had rolled five or six bales, and I and Gus Little had rolled the same number, just before I was injured.'
"John Springer testified for defendant that at the time plaintiff was injured witness and plaintiff were members of a bridge gang of defendant company, under a foreman named Moore, and that at this time this gang were repairing defendant's cotton platform at Kilgore, had repaired the south end of the platform and were moving some bales of cotton from the north end of the platform to the south end in order to repair the north end. `I and two men were rolling one bale and Still and his partner were rolling another. We were tumbling the cotton, rolling it across the platform. Mr. Still and the man with him were right ahead of us and we were just behind him. They let theirs fall and we kept ours tumbling and caught them. They let theirs fall as they went to change it around, and stopped to pick it up. We did not know that they were going to stop. We did not throw our cotton on them purposely. If they had not stopped there the accident would not have happened; if they had kept on going we would not have caught up with them.'
"Cross-examined: `I do not remember how many bales of cotton I, Claude Little and Robert Sims had rolled before Mr. Still was hurt, but I reckon it was something like five or six. I think Joe Still and Gus Little had rolled about the same number of bales. . . . The bales were just ordinary cotton bales, not compressed, and weighing 450 to 500 pounds each. The shed that was on that platform was supported on posts that were at each corner of the shed. In rolling the cotton across the platform we first rolled it west and then turned south. The cotton was on the northeast corner of the platform. . . . In rolling the cotton from the northeast corner of the platform we had to first roll it west to get it even with those planks, and then roll it south across them. We rolled the cotton with our naked hands; we had no hooks. In changing the direction of the cotton as we rolled it I do not remember whether we stopped every bale we rolled or not. . . . The accident happened about ten o'clock in the morning. There was nothing in my way to obscure my vision of Joe Still or to keep me *Page 504 
from seeing him plainly. As well as I remember, Joe Still was facing southwest with this back toward us at the time of the accident. He was stopped and had stooped over for the purpose of starting the rolling of his bale across the planks when the accident happened. I never saw the position his foot was in. There was nothing between me and the two fellows with me and Joe Still and his partner except the bale we were rolling. We rolled the bale of cotton on him and hurt him some way. . . . We were working under Moore's (the foreman's) instructions. Myself and two others were tumbling a bale of cotton behind Still and his partner, and for some cause they stopped. We kept ahead and our bale of cotton came right down on his foot. We did not do it purposely. . . . We had no hooks to use in handling the cotton. There were three of us on the bale of cotton we had, and only two on the front bale. . . . Still's back was to us.'
"W.A. Miller testified for plaintiff: `I was at Kilgore at the time Joe Still, the plaintiff in this case, received the injury to his foot by having a bale of cotton rolled on it on the cotton platform there in March, 1903, and saw the accident. Mr. Still and his partner were rolling the same bale. There were some other parties rolling a bale of cotton just behind them, and in rolling the cotton across the platform, and in making a turn or something of that sort, the bale of cotton fell. Somehow the parties behind let their bale of cotton fall on his foot. When the bale fell on Mr. Still he was in a stooping position, fixing to pick up the bale he was rolling. His back was toward the parties rolling the bale behind him. They rolled their bale up behind him and on his foot.'
"Upon this statement of the evidence we respectfully certify for your decision the following questions:
"Was appellee a fellow servant with the men by whose alleged negligence he was injured, as that status is defined in section 3 of the Act of June, 1897? (4560h Sayles' Civ. Stats.)
"If it be held that under the terms of the Act above mentioned appellee and the men through whose alleged negligence he was injured were not fellow servants, would the application of that Act to railroad employes performing work of the character in which appellee was engaged at the time he was injured, render the Act obnoxious to section 1 of the fourteenth amendment to the Constitution of the United States?"
The statute which defines fellow servants as applied to railroad companies, is as follows: "All persons who are engaged in the common service of such person, receiver, or corporation, controlling or operating a railroad or street railway, and who while so employed are in the same grade of employment and are doing the same character of work or service and are working together at the same time and place and at the same piece of work and to a common purpose, are fellow servants with each other. Employes who do not come within the provisions of this article shall not be considered fellow servants." (2 Batts' Ann. St., art. 4560h.)
The testimony clearly shows that the plaintiff and his fellow laborers were in the same grade of employment and were doing the same character of work and that they were working together at the same time *Page 505 
and place and to a common purpose. Therefore the question propounded resolves itself into the inquiry, were they engaged upon the same piece of work? A similar question came before us in the case of Long v. Chicago, Rock Island Texas Ry. Company (94 Tex. 53), and we there said: "So, too, with the term `piece of work.' In a general sense, changing the rails upon the same part of a railroad track is the same `piece of work.' In a limited sense, the handling of the rails and the driving of a spike is a different piece of work. When applied to the complicated constructions and repairs incident to the business of railroads, terms more indefinite could hardly have been found. We must therefore forbear the attempt to lay down any general rule to be followed in their construction and application and content ourselves with the endeavor to apply them to the particular facts of this case." In that case a number of section men and their foreman were at work upon a section of the defendant's road. In the evening when the work for the day had ceased it became their duty and it was their custom to return the tools to the tool house. Upon the occasion in question in that case, some were returning their tools upon a handcar, while others were carrying them by hand. The injury was to one of the latter and the injury was claimed to have been inflicted through the negligence of one of those engaged in operating the handcar. It was held that those operating the handcar, and those who were carrying the tools by hand, were not engaged in the same piece of work and therefore they were not fellow servants within the meaning of the statute.
The certificate here presents a very different case. Here the employes were employed upon the same work, namely, repairing the platform. In performing it, it became necessary to remove some bales of cotton from a portion of the platform, that was to be repaired, to another part upon which the repairs had already been made. The men were all working together in removing the cotton — a work that was to be done at once and by all of the employes then engaged without any particular part to be accomplished by one or more without connection with the others. We are of the opinion therefore that this was the "same piece of work" within the meaning of the statute. In accordance with the spirit of the provision, we think it consistent to hold that it is not necessary in a case like this to make the employes fellow servants, that the one who inflicted the injury and the injured party should be engaged at the time in removing the same bale of cotton.
We answer the first question in the affirmative. Such being our answer to the first question, an answer to the second is not called for.